UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

| | | |
|---|---|---|
| ELI PORTER, FRANCOIS WILLIAMS, MICHAEL SINGLETON, *and* TIMOTHY VAN BEVERHOUDT, | ) ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| vs. | ) ) | Civil Action File No. |
| SGT. DERRELL THIGPEN, CPL. MATT SOWELL, TFC. JONATHAN MALONE, LT. CHRIS LACIENSKI, TFC2 HAMMOND, TFC3 HOLLOWAY, TFC. AARON DIGIACOMO, DEPUTY JASON MICHAEL BORNE in their individual and official capacities as LEOs, and BRIAN KEMP, in his individual and official capacity as Governor of the State of Georgia, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | 6:22-cv-00057-JRH-BKE |
| *Defendants*. | ) | |

## PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AMENDED COMPLAINT

**COME NOW the Plaintiffs** and file this Brief in Response to Defendant

Borne's Third Motion to Dismiss.

## **Statement of Facts and Background**

COVID-19 and governmental responses to it have caused suffering and hardships for most of society.[1] Plaintiffs have not only been harmed financially, but some have been deprived of their liberties to the extent that they were prosecuted for engaging in constitutionally protected freedom of worship.

On March 14, 2020, Defendant Kemp issued a "Public Health State of Emergency" and issued various executive orders, depriving the rights of citizens who were not engaged in any crime to remain locked in their homes on house arrest.

Under these "shelter in place" orders, citizens were classified as "essential" or "non-essential," and were not permitted to leave their homes unless they were engaging in an activity that would be deemed "essential" by the government—mainly, Defendant Kemp. The amount of people permitted in one location depended on the purpose for the presence at such location.[2] Further, the Governor unilaterally dictated which citizens, organizations, businesses, and conduct were deemed "essential" or "non-essential." Those which, in Defendant Kemp's eyes, were deemed "non-essential" were only permitted to "engaged in Minimum Basic Operations" defined—again unilaterally—by Defendant Kemp within the order.[3]

On April 5, 2020, Plaintiffs engaged in worship at Bible Way Church,

---

[1] Complaint, p.1.
[2] Executive Order No. 03.23.20.01 rquired certain persons to "shelter in place," not allowing more than ten people to be gathered , where Executive Order No. 04.02.20.01 prohibited social interactions except in cases where the Governor deemed such travel or conduct to be "essential."
[3] Id.

including baptisms, which are essential in the spiritual cleansing and outward expression of profession of faith in the Christian faith. To many citizens, religious sacraments and worship are necessary and essential activities, and protected to the highest extent under the federal and state constitutions. Defendants Thigpen, Sowell, Malone, Lacienski, Hammond, Holloway and DiGiacomo then cited Plaintiffs for "reckless conduct" for engaging in worship "according to the dictates of [their] own conscience[s]"[4] pursuant to Defendant Kemp's executive orders.

Defendants now request that this Court dismiss the amended Complaint, while admitting that Defendant Kemp intended that the otherwise lawful exercise of religion be deemed as "non-essential".

<u>**Argument**</u>

The Constitution of the State of Georgia was drafted and ratified for the purpose of "perpetuat[ing] the principles of free government, insure justice to all, preserv[ing] peace, promot[ing] the interest and happiness of the citizen and of the family, and transmit[ting] to posterity the enjoyment of liberty." Ga. Const. Preamble. In so doing, the People of the State of Georgia "[rely] upon the protection and guidance of Almighty God[.]" Id. An act destructive to the purpose of this Constitution as laid out in its Preamble would be for an elected Chief Executive to violate the inherent and inalienable right of the citizens of this State to worship God

---

[4] Ga. Const. Art. I, Sec. I, Para. III

according to the dictates of their own conscience, and attempting to criminalize such worship by the mere stroke of a pen.

In anticipation of such act of tyranny, the drafters of our honorable Constitution ensured the protection of posterity with the reminder that "[a]ll government, of right, originates with the people, is founded upon their will only, and is instituted solely for the good of the whole." Ga. Const. Art. I, Sec. II, Para. I. It further declares that "[p]ublic officers are the trustees and servants of the people and are at all times amenable to them." Id. In other words, the structure of our state government begins and ends with the People.[5]

### A. Plaintiffs' claims are not barred by the Eleventh Amendment and sovereign immunity because Defendants removed this case to federal jurisdiction

A state waives its Eleventh Amendment immunity when it removes a case from state court to federal court. Lapides v. Board of Regents of University System of Georgia, 535 U.S. 613 (2002).

Plaintiffs initially filed this case in state court against all Defendants. Each Defendant consented to the removal of this case to federal court, and therefore consented to the jurisdiction of federal court. This includes in cases for suits involving money damages. Id.

---

[5] See also Ga. Const. Art. I, Sec. II, Para. II (declaring that the "people of this state have the inherent right of regulating their internal government[, as] [g]overnment is instituted for the protection, security, and benefit of the people; and at all times [the people] have the right to alter or reform the same whenever the public good may require it.")

Defendants argue that Plaintiffs' claims are barred by the Eleventh Amendment of the United States Constitution absent a waiver by the state or a valid congressional override, and subsequently argue that there is "[neither] a state waiver, nor a congressional override for a § 1983 claim." Defendants state that because the State of Georgia has not consented to being sued under § 1983, it has essentially preserved its sovereign immunity from lawsuits by citizens for constitutional violations, and therefore Plaintiffs' claims must fail. This reasoning, however, is flawed, given that pursuant to the Supremacy Clause of the Constitution of the United States, where federal § 1983 civil rights law trumps any claim of state sovereignty to lawsuits for its constitutional violations against its citizens. It additionally fails because of the waiver of the Eleventh Amendment protection due to removing this case to federal court instead of litigating in state court where Plaintiffs originally filed. For these reasons, Defendants' arguments under the Eleventh Amendment fail.

**B. Plaintiffs have sufficiently stated claims for First Amendment Retaliation**

To prevail on a First Amendment Retaliation claim, a plaintiff must show that (1) he engaged in a constitutionally protected speech; (2) the defendant's retaliatory conduct adversely affected the protected speech; and (3) there is a causal connection between the retaliatory actions and the adverse effect on speech. Bennett v. Hendrix, 423 F.3d 1247, 1250 (11th Cir. 2005). Plaintiffs meet all three requirements in this

case.

First, Plaintiffs were engaged in obvious constitutionally-protected speech as they engaged in the freedom of worship amongst the members of their congregation, including baptisms. Freedom of worship is explicitly protected in the First Amendment of the federal Constitution.

Secondly, Defendants took adverse actions against Plaintiffs for engaging in their right to worship by citing them for a crime. The Eleventh Circuit analyzes "adverse action" as "only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights[.]" Id. Other jurisdictions articulate this to be conduct that "would chill a person of ordinary firmness from continuing in the activity." See Scheffler v. Molin, 743 F.3d 619, 621 (8th Cir. 2014). In this case, Defendant Kemp essentially criminalized the freedom of worship and the remaining defendants took enforcement action against it pursuant to Defendant Kemp's orders. Any person "of ordinary firmness" would think twice about engaging in their religious practices if they knew they would be met with handcuffs, a jail cell, and a legal bill to defend against such an unconstitutional order.

Finally, Plaintiffs can establish the required causal connections between the retaliatory action and the adverse effect on protected speech. Had it not been for the fact that Plaintiffs freely worshiped God by the dictates of their own conscience by holding services and partaking in baptisms, or had they not been on the church

premises at all, the defendant law enforcement officers would not have stopped to harass Plaintiffs and demand they engage with the officers, nor would the defendants have cited Plaintiffs as stated in their own motion to dismiss. As for Defendant Kemp, he not only engaged in retaliation of protected religious speech and conduct by choosing to try and criminalize it unilaterally as the Chief Executive, but also by ordering the retaliation by authorizing and directing law enforcement officers to enforce the unconstitutional executive orders.

Perhaps the most chilling realization is that Defendants admit in their motion to dismiss that Defendant Kemp intended to criminalize religious worship unilaterally via his unconstitutional executive orders, which Defendant Kemp did not have the authority to do, not only because of the fact that it would be unconstitutional to criminalize the exercise of religion, but also because it violated separation of powers. The doctrine of separation of powers, as an immutable constitutional principle, is one which must be "strictly enforced". Allen v. Wright, 282 Ga. 9, 12 (2007). The "power to make all laws" under the Georgia Constitution are vested in the legislative body of the General Assembly, not the Executive Branch of the Governor. Ga. Const. Art. 3, Sec. 3, Para. I. Such legislative power, however, cannot be "inconsistent with [the Georgia] Constitution, and not repugnant to the Constitution of the United States[.]" Id. As such, even the legislature does not have the power to override the constitutional rights of the People where it is expressly

establish in the State and Federal Constitutions.

### C. Plaintiffs have sufficiently stated claims under the Free Exercise Clause of the First Amendment

A person's right to the expression of worship is a protected activity under the First Amendment of the United States Constitution. Additionally, the Constitution of the State of Georgia is explicitly clear that "[e]ach person has the *natural* and *inalienable* right to worship God, each according to the dictates of that person's own conscience; and *no human authority should, in any case, control or interfere with such right of conscience*." Ga. Const. Art. I, Sec. I, Para. III (emphasis added).[6] Where a restriction is content-based or targets religious activity, such restriction must withstand strict scrutiny. Roman Catholic Diocese of Brooklyn v. Cuomo, 141 S.Ct. 63 (2020).

First, whenever government regulations treat any comparable secular activity more favorably than religious exercise, they are not neutral, not generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause. Roman Catholic Diocese of Brooklyn, 141 S. Ct. 63, 67, 208 L. Ed. 2d 206 (2020) (per curiam); Tandon v. Newsom, 141 S. Ct. 1294, 1296 (2021) (per curiam). It is no answer that a State treats some comparable secular businesses or other activities as poorly as or

---

[6] As early as April 4, 2020, Defendant Kemp stated to Baptist pastors in a conference that he has "a strong belief that now, more than ever, our people need their faith leaders[.]" Judd, Alan, No ban on services, but Kemp urges staying home for Easter amid COVID, THE ATLANTA-JOURNAL CONSTITUTION, Apr. 10, 2020 (visited July 28, 2023) https://www.ajc.com/news/ban-services-but-kemp-urges-staying-home-for-easter-amid-covid/omlK7XpTK66uP230qJO13O/

even less favorably than the religious exercise at issue. Id. (Kavanaugh, J.,

concurring).

Second, whether two activities are comparable for purposes of the Free

Exercise Clause must be judged against the asserted government interest that justifies

the regulation at issue. Id. at 358 (per curiam) (describing secular activities treated

more favorably than religious worship that either "have contributed to the spread of

COVID-19" or "could" have presented similar risks). Comparability is with the risks

various activities pose, not the reasons why people gather. Id. (Gorsuch J.,

concurring).

Third, the government has the burden to establish that the challenged law

satisfies strict scrutiny.  To do so in this context, it must do more than assert that

certain risk factors "are always present in worship, or always absent from the other

secular activities" the government may allow. South Bay United Pentecostal Church

v. Newsom, 592 U. S. ___, ___, 141 S. Ct. 716, 718, 209 L. Ed. 2d 22 (2021)

(statement of Gorsuch, J.); id., at ___ (Barrett, J., concurring). Instead, narrow

tailoring requires the government to show that measures less restrictive of First

Amendment activity could not reduce the spread of COVID. Where the government

permits other activities to proceed with precautions, it must show that the religious

exercise at issue is more dangerous than those activities even when the same

precautions are applied. Otherwise, precautions that suffice for other activities suffice

for religious exercise as well. <u>Roman Catholic Diocese</u>, 141 S. Ct. 63, 69, 208 L. Ed.
2d 206; South Bay, (statement of Gorsuch, J.); <u>see also</u> <u>Tandon</u>, 141 S. Ct. at 1297.

Strict scrutiny requires the State to further "interests of the highest order" by
means which are "narrowly tailored in pursuit of those interests." <u>Church of
Lukumi Babalu Aye, Inc. v. Hialeah</u>, 508 U. S. 520, 546, 113 S. Ct. 2217, 124 L.
Ed. 2d 472 (1993) (internal quotation marks omitted). That standard "is not
watered down"; it "really means what it says." Ibid. (quotation altered). <u>Tandon</u>,
141 S. Ct. at 1298.

Under that strict scrutiny analysis, the government must show that the
restriction of an inherent right is narrowly tailored to further a compelling
government interest. In the present case, reading the entirety of Defendants' brief
makes it blatantly clear that the restrictions in the COVID orders were not only
content-based, but also targeted toward worship. They were not generally
applicable. Here, the question is not whether non-religious groups or entities were
treated just as badly as churches such as Bible Way, but whether other groups were
treated *better*. If they were treated better, then religious exercise, and therefore
Bible Way, were being targeted by government, when they are protected from such
targeting by the Constitution.

In closer examination, the orders segregate permissible versus impermissible
conduct or purposes for gatherings, where certain things were "essential," while all

else was deemed "non-essential". Defendants boastingly admit that religious

activities were meant to be excluded from permitted conduct:

> [Plaintiffs cannot meet probable cause requirements] because Governor
> Kemp's executive orders required Georgia residents to "shelter in place
> within their homes or places of residence" unless engaged in "necessary" or
> "essential" activities, and gathering together to worship was not considered a
> necessary or essential activity.[7]

Given this admission, Defendants, including Defendant Kemp, admit that engaging

in traditionally-recognized religious activity protected under the Constitutions of

the United States and of the State of Georgia was treated as a violation of law and

punishable under threat of criminal prosecution!

"Critical Infrastructure" was another classification, but the measures dictated

by Defendant Kemp were things that were suggested (not mandated) with the

language of "may", which set up another group that was being treated more

favorably than religious worship. These same measures were mandated upon those

remaining who were not deemed "Critical Infrastructure", which included Bible

Way.

Religious exercise, which is constitutionally considered a most-protected

activity, was intentionally treated less favorably for political or other convenience

by the Defendants. This is contrary, however, to a press release that Defendant

Kemp later published on February 18, 2021 where he sought to pass the "Faith

---

[7] Motion to Dismiss p. 10.

Protection Act".[8] In the published release, Defendant Kemp claimed to seek to ensure that "the emergency powers of any governor of Georgia in the years to come are not used to limit the God-given right to worship."[9] He further declared to seek that Georgia become a "sanctuary state for people of faith."[10]

Groups that were not churches were permitted to remain open, such as beaches, parks, golf courses, and many businesses. In such places, law enforcement officers were not seen citing people for reckless conduct, nor even attempting to conduct an investigative stop when seeing cars in the parking lots of these places in order to ensure compliance with Defendant Kemp's orders. For these reasons, strict scrutiny is the proper standard of judicial review.

Despite Defendants' arguments that rational basis should be applied in lieu of the correct standard of strict scrutiny, Defendant Kemp's COVID Orders would be unable to survive even rational basis scrutiny. If every person is a potential disease vector, there is no rationality in allowing favored businesses or industries to operate and spread a disease while preventing people from other businesses or industries to do so. The simple fact that all of Defendants (who themselves could have been disease vectors) were interacting, in close proximity, with people that Defendants are now claiming could have been vectors of disease, shows the irrationality of such

---

[8] Gov. Brian P. Kemp, Office of the Governor, Feb. 18, 2021 (last accessed on July 28, 2023)
https://gov.georgia.gov/press-releases/2021-02-18/governor-kemp-rolls-out-faith-protection-act-legislation
[9] Id.
[10] Id.

behavior.

Indeed, politically calculated motivations in both creating a false sense of security and/or helping favored businesses remain profitable while shuttering small businesses, do not even pass a rational basis standard of review.

Defendants obviously fail to argue that they could meet the strict scrutiny standard. Instead, Defendants argue that the Court should analyze the violation of Plaintiffs' right to worship under a weaker and inapplicable standard, inaccurately claiming that this is a content-neutral restriction, despite the fact that religious content is obviously different than commercial content, or entertainment content in a movie theater. This impliedly concedes that they their actions cannot overcome strict scrutiny.

Defendants ignore that Defendant Kemp's executive order made some conduct permissible as "essential" and other conduct prohibited and allegedly subject to a prosecution for a misdemeanor. Defendants claim that "the order treated all places where people might congregate in large groups for substantial periods of time . . . [and] they were all ordered to cease their operations, and citizens were barred from accessing their services."

What was "essential" was a very limited list of what Defendant Kemp subjectively deemed to be "essential" which was vague and arbitrarily applied with no guidance as to how to determine whether one's conduct was permissible under

Defendant Kemp's unconstitutional orders, and did not treat all groups congregating equally.

As Georgia provides the added protection on rights such as speech so as to require that the government use the least restrictive means in order to protect as much speech as possible, strict scrutiny is the correct standard.

Under strict scrutiny, Defendants cannot show that the restrictions imposed with the prohibition against worship was necessary and narrowly tailored in order to further a compelling government interest. Even if the government's interest in protecting citizens against a pandemic were compelling, it did not prohibit activities that it deemed "essential," which was a vague term that was arbitrarily imposed.

## D. Plaintiffs have sufficiently stated claims for unlawful seizure under the Fourth Amendment

Defendants argue that Plaintiffs cannot make a Fourth Amendment claim because the defendant law enforcement officers had "reasonable suspicion" to conduct an investigatory stop. However, the conduct they cited for "reasonable suspicion" included church gathering, leading worship services, being physically present on the premises of a church during worship services, and then label such conduct as a "misdemeanor offense." Unfortunately to Defendants, the Constitution is destructive to their arguments. There is nothing unlawful about going to church, being present at a church, partaking in worship services, nor leading worship services. In fact, such conduct is expressly permitted under the First Amendment of

the Constitution of the United States, and under Art. I, Sec. 1, Para. III of the Georgia

Constitution, explicitly stating that:

> [e]ach person has the **natural** and **inalienable** right to worship God, each according to the dictates of that person's own conscience; **and no human authority should, in any case, control or interfere with such right of conscience**. (Emphasis added).

As previously stated, the Governor has no authority to revoke that right unilaterally,

nor to criminalize such religious practices, as this is a violation of separation of

powers.

While the Georgia Constitution indeed conveys some power to the

government to suspend a constitutional right, that is only limited to the right to a writ

of habeas corpus, and can only be suspended upon the condition precedent of either

an invasion or rebellion. Ga. Const. Art. I, Sec. I, Para. XV. While the State certainly

has the authority to take certain precautions to protect citizens from a communal

disease during the emergency of a pandemic, this authority does not extend to the

ability to suspend any or all rights preserved under the Constitution of the United

States or of the State of Georgia, as such authority to do so was not included when

the drafters of the Georgia Constitution excluded the right to a writ of habeas corpus,

but no other rights. Furthermore, they did not include a pandemic as a condition

precedent for such suspension of rights.[11] In any case, engaging in worship is not

---

[11] While Defendants may argue that the drafters of the Georgia Constitution could not have contemplated such a condition as a pandemic, such argument should not be accepted as fact considering that the Revolutionary War was

reasonable suspicion to justify an investigatory stop, and by arguing that they could do so under these conditions, Defendants are essentially admitting to violating their oaths of office where they swore to uphold and defend the Constitution of the United States and of the State of Georgia.

Finally, while Defendants argue that violation of the unconstitutional executive orders was a misdemeanor, Plaintiffs were not cited under the order, despite that being the pretext of harassing Plaintiffs at church, but rather they were cited under the reckless conduct statute. Reckless conduct does not cover constitutionally protected conduct such as engaging in worship as many Americans do on a daily or weekly basis, and to apply it to such conduct would make the statute unconstitutionally vague and broad.

### E. Plaintiffs have sufficiently stated a Right to Counsel claim under the Fifth Amendment

Defendants argue that Plaintiffs were not subjected to a custodial interrogation because they were not formally arrested, nor were they blocked from exiting the parking lot. However, the test for determining whether one is being arrested is an objective one, and requires the courts to analyze four factors, including (1) the site of the interrogation, (2) whether the investigation has focused on the subject, (3) whether the objective indicia of arrest are present, and (4) the length and form of

---

fought during a smallpox epidemic and Georgia, as one of the original thirteen colonies who declared independence and drafted its own constitution, did not include such an emergency in the document.

questioning. Stansbury v. California, 511 U.S. 318, 321-23 (1994). In the totality of the circumstances, the test requires the court to determine whether a reasonable person would have felt free to end the encounter.

In the present case, multiple law enforcement officers were present on church property stopping multiple members of the congregation in an attempt to identify the pastor. Officers were also obtaining license plate numbers of each vehicle in order to identify all persons present at the church. About half a dozen law enforcement officers narrowed in on the four Plaintiffs, all of whom unequivocally expressed to law enforcement that they did not wish to speak to them. In response to the unequivocal statement that Plaintiffs did not wish to speak to law enforcement, Defendant Thigpen continued to harass Plaintiffs by requesting "voluntary compliance," and informing them that should their compliance not be "voluntary," then it would be mandated. This continued for the duration of the church service, and through the time that members exited the church as law enforcement narrowed in on Plaintiff Porter, the pastor of the congregation.

After the repeated attempts to multiple law enforcement officers to not only end the encounter, but state unequivocally that they did not wish to speak with them without an attorney, and by law enforcement indicating in response that should Plaintiffs not voluntarily comply with the requests for cooperation with law enforcement, then compliance would be mandated, no reasonable person would have

felt free to leave and end the encounter. For these reasons, Plaintiffs objectively were in custody and entitled to have all communications cease once they requested that the interrogations stop without their attorney present.

### F. Plaintiffs have sufficiently stated a claim under the Ninth Amendment

While Defendants claim that Plaintiffs cannot bring a Ninth Amendment claim standing alone, Plaintiffs have pleaded this concurrently with a Due Process claim. The Ninth Amendment claim, therefore, should stand.

### G. Plaintiffs have sufficiently stated a due process claim

As previously stated, the Governor as the Chief Executive cannot unilaterally criminalize conduct, nor can he unilaterally deprive citizens of their inalienable rights to worship. Law enforcement officers also cannot take enforcement action based on unconstitutional mandates. By depriving Plaintiffs of their right to attend church by the mere stroke of a pen, and by taking enforcement action pursuant to that unconstitutional pen stroke, Defendants violated Plaintiffs' due process rights.[12]

### H. Plaintiffs have sufficiently stated an Equal Protection claim

Defendants argue that Plaintiffs' factual pleading that "churchgoers of congregations which were not predominantly African-American were not targeted" is "conclusory. However, this is a factional statement, not a legal conclusion, and

---

[12] While Defendants cite to the Herrin v. Reeves case from Mississippi where the court suggests that any restriction "designed to save human lives" is justifiable, it should be noted that the State of Georgia has not authorized the suspension of the right to worship within its Constitution, nor does it convey any authority over a person's soul to the government.

Plaintiffs expect there to be supporting evidence upon exchange of discovery. Such factual statements must be taken as true for purposes of a motion to dismiss a complaint. Furthermore, Defendants failed to cite to any instance in which other churches that were not predominantly African American were prosecuted for violating executive orders under similar facts. For this reason, the Court should deny Defendants' motion based on this argument.[13]

### I.   Plaintiffs' § 1983 claims are not barred by Qualified Immunity

To receive qualified immunity, a public official must first demonstrate that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. If a defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity.[14]

If a defendant was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.[15] The Supreme Court has set forth a two-part test for use in qualified immunity analysis. The Court must determine whether the plaintiff's allegations establish a constitutional violation, and, if so, whether the constitutional right that the plaintiff seeks to assert was clearly established. Id. (citing Hope v. Pelzer, 536 U.S. 730, 736, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) and Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150

---

[13] Multiple sources can be found, however, showing that Bible Way was cited and prosecuted for reckless conduct for holding church in violation of Defendant Kemp's orders, including articles cited in footnotes in this brief.

[14]   *See* Williams v. Consol. City of Jacksonville, 341 F.3d 1261, 1267 (11th Cir.2003) (quoting Lee, 284 F.3d at 1194); *See Also* Payne v. DeKalb Cty., 414 F. Supp. 2d 1158, 1169 (N.D. Ga. 2004).

[15]   Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).

L.Ed.2d 272 (2001)). Therefore, the Court must first analyze whether the actions of defendants, under plaintiff's version of the facts, violated plaintiff's constitutional rights.[16]

In Payne v. DeKalb Cty, the Court illustrates the difference between non-discretionary authority and the discretionary authority acting as a police officer. In Payne, an officer was upset and quarreling with a neighbor (the plaintiff in that case). The officer proceeded to move to have the plaintiff from that case arrested, which the officer succeeded in doing, including by contacting another officer and a magistrate. After the fact, she then claimed that she was acting under her discretionary authority as an officer to attempt to gain the benefit of immunity. The Court, to the contrary, held that the officer was not acting within her discretionary authority when she moved to have the plaintiff arrested, as she was not grappling with a "fast-changing, potentially volatile situation" but instead was able to "calmly assess the situation".[17] In essence, the Court do not allow officers claiming to be stopping crime carte-blanche to violate rights and have people who bother them arrested.

This ability to calmly contemplate the situation, and not target citizens under the cloak of discretionary authority, is the situation presented here.

As described throughout this brief and the Complaint, the rights which Defendant Kemp's COVID Orders violated, restricted, and infringed were all clearly

---

[16] Payne v. DeKalb Cty., 414 F. Supp. 2d 1158, 1169 (N.D. Ga. 2004).

[17] Payne v. DeKalb Cty., 414 F. Supp. 2d 1158, 1171–72 (N.D. Ga. 2004).

established and fundamental rights of Georgia and United States citizens. Regardless of Defendant Kemp's intentions in signing the various unconstitutional COVID Orders, the existence of a pandemic, and the political pressures that places on Defendant Kemp, do not allow Defendant Kemp to abdicate his responsibility to uphold and defend the Constitution of Georgia or the United States Constitution. This is equally true regarding the remaining defendant law enforcement officers who knowingly enforced an unconstitutional order in violation of their oaths of office.

At the Motion to Dismiss stage, with the factual allegations of the Complaint taken as true, there are no grounds for finding that Defendant Kemp did not knowingly violate the rights of Georgians guaranteed under the Constitution of the United States.

**J.  Plaintiffs' state law claims are not barred by Sovereign Immunity**

Defendants Kemp and GSP officers cite to the Georgia Tort Claims Act ("GTCA") to claim that a state officer or employee who commits a tort while acting within the scope of his or her official duties or employment is not subject to liability thereof. However, the overlooked part of the statute by the Defendants is "acting within the scope of his or her official duties or employment". Since Defendants were not doing so, they are subject to suit like any other citizen, and that is why they are being sued directly.

The GTCA does not mean that a state officer or employee can violate state

law, or the state or federal constitutions, and then receive immunity while acting outside of the scope of duties or employment, as the Constitution has primacy over the Georgia Tort Claims Act.

Using an extreme example to prove the point, the Governor would not be cloaked in immunity from a civil tort claim if he pulled out a gun and, unprovoked, shot and killed a constituent that he did not like, nor would he be immune from suit if he ordered a GSP officer to do the same and the GSP officer did so. Was the action a tort? Yes. Was it an action that is authorized by law for the government official to carry out? No. Likewise, the GSP officer would not and should not have immunity for carrying out such actions either.

This is because such actions are not within the scope of their official duties or employment, despite the fact the Defendants may have jobs or employment with the State of Georgia while carrying out the activities. The Georgia Constitution, the Federal Constitution (incorporated to the states), and Georgia law dictate what "…the scope of his or her official duties or employment…" cover, and nothing within the plain meaning of the words in those documents authorize any government official, including but not limited to Defendant Kemp, to order state or county employees to detain or arrest people for taking part in religious worship. Nothing authorizes them to violate the Constitutions. Nothing within the plain meaning of the words in those documents authorize the Defendant GSP officers to do the same or similar actions.

22

To the contrary, those documents, specifically the Bill of Rights to the Federal Constitution and the Georgia Constitution, limit the scope of duties and employment of government officials. Specifically, shutting down worship services that are not violating any other generally applicable Georgia law is outside the scope and duties of any government official, as such is plainly unconstitutional. Just like everyone else, they are presumed to know the law (including the Constitution) and not violate it.

The rest of Defendants' arguments regarding sovereign immunity rely on the premise that the GTCA applies to the state law claims against them. Given that it does not, these claims should proceed to trial.

And, even assuming *arguendo* that the GTCA does apply (which we vehemently claim does not), the Seventh Amendment to the United States Constitution guarantees civil jury trials in federal courts, and such amendment would take precedence over the GTCA's attempt to protect government from liability.

### K. Plaintiffs sufficiently stated a claim for malicious prosecution based on federal law

To prevail on a malicious prosecution claim, the plaintiff must show that the defendant instigated a criminal proceeding with improper purpose without probable cause. McDonough v. Smith, 139 S.Ct. 2149, 2156 (2019). Additionally, a plaintiff must further prove that the criminal prosecution was resolved in the plaintiff's favor. Id. Defendants argue that Plaintiffs were required to show "an inquiry before a

23

committing court or a magistrate", and that Plaintiffs did not actually go before a magistrate. However, Plaintiffs pleaded that they were cited for reckless conduct, which under Georgia law include a summons to appear in court. Defendants' argument, therefore, fails.

## L. Plaintiffs sufficiently stated a Failure to Intervene claim against Defendants Sowell and Malone

Defendants erroneously contend, as they have throughout their motion (and prior pleadings) that this claim -- like every other asserted claim -- is insufficiently pled as "too conclusory."  However, Plaintiffs allege all the necessary elements of a failure-to-intervene claim.  First, Plaintiffs allege that Defendants Sowell and violated their constitutional rights in various ways -- as set forth in related claims that have been expressly incorporated in this claim -- including the unconstitutional violation of their free exercise of religion.  Second, Plaintiffs allege that

Defendants Sowell and Malone knew of these constitutional deprivations, giving each defendant a reasonable opportunity to intervene to prevent them under the circumstances of this case -- as unlike in some excessive force cases that may happen suddenly and without warning -- clearly there was ample opportunity to intervene in this citation of Plaintiffs.  Accordingly, the failure to intervene claim is sufficiently pled.

Defendants further erroneously contend that no constitutional violations or deprivations took place but such contentions have already been addressed elsewhere.

Defendants add nothing new here by summarily repeating the same contention.

Defendants also apparently contend, as they do with respect to other claims, that they are entitled to qualified immunity as to the failure to intervene claim. However, the authorities within the Eleventh Circuit are far less clear than Defendants suggest.  See, e.g., Tarantino v. Citrus County Gov't, 2014 U.S. Dist. LEXIS 124132, 2014 WL 4385550 (reviewing the many authorities within the Eleventh Circuit and from other Circuits recognizing the viability of failure to intervene cases beyond the context of excessive force as far back as 2014).  More recent cases in support of the same proposition include Bledsoe v. Carreno, 53 F.4th 589, 2022 U.S. App. LEXIS 31579, 2022 WL 16942631 (10th Circuit 2022). Moreover, a "narrow exception" to the requirement of particularized case law exists where "the official's conduct lies so obviously at the very core of what the Constitutional protection prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw." Priester, 208 F.3d. at 926 (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir.1997)).  That exception clearly applies to the case at hand.  Indeed, it is difficult to imagine what could be closer to the core of the Free Exercise Clause of the First Amendment than the right of Christians to worship in church.

**M. Plaintiffs' request for declaratory and injunctive relief is proper**

Declaratory and injunctive relief are available both under 42 U.S.C. § 1983,

and, newly, under state law. While Defendants argue that Plaintiffs failed to state a claim for any constitutional violation, they are essentially implying throughout their Motion to Dismiss that, should the Governor declare an emergency, then he can unilaterally suspend the Constitution of the United States and the Constitution of the State of Georgia, with zero authority within either document to substantiate such a ludicrous position. Their argument further rests on this absurdly narrow view that in order to seek injunctive relief that Plaintiffs had to have been engaged in some sort of "public comment criticizing government officials" when they were cited for reckless conduct. However, no such narrowed limitation is required to support injunctive relief, and Defendants ignore the fact that the civil disobedience in which the Plaintiffs engaged in order to defend their own rights to worship—a constitutionally protected act—was indeed a form of comment of public criticism. See Texas v. Johnson, 491 U.S. 397, 404 (1989) (explaining that First Amendment protection "does not end at the spoken or written word[,]" and expressive conduct is protected under the First Amendment where there is "[a]n intent to convey a particularized message" and there is a great likelihood "that the message would be understood by those who viewed it."[18]

    As shown throughout the Complaint in this brief, Defendants' actions are

_____

[18] Civil disobedience has historically been seen is a constitutionally moral form of peaceful protest and one of the "exponents" of the doctrine of judicial review. See Katz, Michael, The Massachusetts Review, Vol. 11. No. 1 (Winter, 1970) at 163 (acknowledging that the higher courts via judicial review provide "the foundation for the claim that, under certain conditions, the deliberate violation of positive laws is morally justified.")

beyond the pale and unconstitutional. Plaintiffs should prevail on the merits, and are suffering current, immediate, and irreparable harm through the interference with their rights, including but not limited to restrictions on business and speech. Roman Catholic Diocese of Brooklyn v. Cuomo clearly states that unconstitutional restrictions on speech are immediate dangers that should be weighed heavily against the government. While COVID may be dangerous, the Court ultimately held that restrictions must be in accord with the law and should be enjoined when inappropriate.

While Plaintiffs have not described Defendant Kemp's issuance of COVID Orders as a "power grab", it was a complete abdication of legislative authority by the General Assembly, as most of them have remained silent while Defendant Kemp unconstitutionally issued COVID Orders which exceeded his authority and were tantamount to legislative activity (which is forbidden by the Georgia Constitution).

The fact citizens are threatened by COVID does not reduce the threat to citizens, their futures, lives, health, and livelihoods by Defendant Kemp and other government entities. History has shown, from the illegal suspension of *habeas corpus* during the Civil War, to the unconstitutional internment of Japanese-Americans during World War 2, to the COVID Orders today, that ignorance and fear will lead to unconstitutional governmental actions that violate the rights of citizens out of the desire for "safety", but that they are ultimately on the wrong side of history and

27

justice.

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs'

Complaint should be denied, and the parties should conduct discovery.

WHEREFORE, Plaintiffs pray that this Honorable Court deny Defendants'

motion to dismiss.

Respectfully submitted this 28th day of July, 2023.


/s/ Jessica Burton
Jordan Johnson
Georgia State Bar No. 673643

Jessica Burton
Georgia State Bar No. 916253
Attorneys for Plaintiff

Bernard & Johnson, LLC
5 Dunwoody Park
Suite 100
Atlanta, GA  30338
404.477.4755
404.592.9089 (Fax)
Alex@Justice.Law
Jessica@Justice.Law


Kevin Gough
Georgia State Bar No. 303210
Attorney for Plaintiff


Kevin Gough Firm, LLC
P.O. Box 898
501 Gloucester Street, Suite 121
Brunswick, GA 31521
Phone: (912) 266-5454

28

Fax: (912) 480-9280
Kevingough.firm@gmail.com

## CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that the foregoing Plaintiffs' Initial

Disclosures has been submitted to the Clerk of Court using the CM/ECF e-filing

system and served upon Defendants' counsel of record:

Amelia C. Stevens, Esq.
Pat T. O'Conor, Esq.
Oliver Maner LLP
218 West State Street
Savannah, GA 31401
astevens@olivermaner.com
pto@olivermaner.com

Angela Ellen Cusimano, Esq.
Georgia Department of Law
40 Capitol Square, SW
Atlanta, GA 30334-1300
ecusimano@law.ga.gov

This 28th day of July, 2023.

/s/ Jessica Burton
Jordan Johnson
Georgia State Bar No. 673643

Jessica Burton
Georgia State Bar No. 916253
Attorneys for Plaintiff

Bernard & Johnson, LLC
5 Dunwoody Park
Suite 100
Atlanta, GA  30338
404.477.4755
404.592.9089 (Fax)
Alex@Justice.Law
Jessica@Justice.Law