**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**STATESBORO DIVISION**

| | |
|---|---|
| ELI PORTER, et al., | |
| *Plaintiffs,* | |
| vs. | CIVIL ACTION NO. 6:22-cv-00057-JRH-BKE |
| SGT. DERRELL THIGPEN, et al., | |
| *Defendants.* | |

## <u>REPLY IN SUPPORT OF DEFENDANTS GOVERNOR KEMP, THIGPEN, SOWELL, MALONE, LACIENSKI, HAMMOND, HOLLOWAY, AND DIGIACOMO'S MOTION TO DISMISS</u>

Defendants Governor Brian Kemp, Darrell Thigpen, Matt Sowell, Jonathan Malone, Chris Lacienski, Brent Hammond, Jamay Holloway, and Aaron DiGiacomo, through counsel, file this reply in support of their motion to dismiss Plaintiffs' second amended complaint. Defendants rely primarily on the arguments set forth in their initial brief (Doc. 29) and submit this reply only to address several of Plaintiffs' arguments.

**A.      The Eleventh Amendment and sovereign immunity bar Plaintiffs' official-capacity claims for monetary damages under § 1983.**

The law is clear that "[t]he Eleventh Amendment prohibits actions against state officials acting in their official capacity for monetary damages." *Mays v. Joseph*, 2022 U.S. App. LEXIS 87, *5 (11th Cir. Jan. 3, 2022).  The Eleventh Circuit has therefore repeatedly affirmed the dismissal of official-capacity claims for monetary damages under § 1983 that are asserted against state actors.  *See, e.g.*, *Freeze v. Sec'y*, 825 Fed. App'x 606, 609 (11th Cir. 2020); *Caffey v. Ala. Supreme Court*, 469 Fed. App'x 748, 751 (11th Cir. 2012); *Cross v. Ala. Dep't of Mental Health*, 49 F.3d 1490, 1503 (11th Cir. 1995).

Plaintiffs argue in their response brief that Defendants "waived" their immunity by removing the case from state court to federal court. Doc. 33 at 4. In support, they cite *Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613 (2002). *Id.* But Plaintiffs misunderstand *Lapides*. There, the Supreme Court held that "removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter … *in a federal forum*." *Lapides*, 535 U.S. at 624 (emphasis added). In other words, *Lapides* addressed the State's immunity from being sued *in federal court*. And as the Eleventh Circuit made clear in *Stroud v. McIntosh*, 722 F.3d 1294, 1302 (11th Cir. 2013), this type of forum immunity has no impact on the State's "underlying sovereign immunity." In short, Defendants' removal of this action waived only their right to object to litigating *in federal court*; it did not waive their sovereign immunity. *See, e.g.*, *Page v. Hicks*, 773 Fed. App'x 514, 518 (11th Cir. 2019) (explaining that the Board of Regents' removal of the case to federal court did not "affect the Board's immunity from liability for monetary damages").

**B.    Plaintiffs failed to state a claim for retaliatory arrest under the First Amendment.**

A retaliation claim under the First Amendment typically has only three elements: (1) the plaintiff engaged in protected activity; (2) the defendant's conduct adversely affected his protected activity; and (3) a causal connection exists between the adverse conduct and the protected activity. *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005). But when "the claimed retaliation … is a criminal charge," *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1291 (11th Cir. 2019), the plaintiff must also "plead … the absence of probable cause" *Nieves v. Bartlett*, 139 S. Ct. 1715, 1723 1724 (2019). This is because in a retaliatory-arrest case (like this one) "the presence of probable cause will typically invalidate [the] claim." *DeMartini*, 942 F.3d at 1294–95. This is true even if the plaintiff engaged in protected activity, which is "often a

wholly legitimate consideration for officers when deciding whether to make an arrest." *Id.* at 1296.   Here, even though Plaintiffs were attending church (an activity that is protected under the First Amendment), they were *also* violating the law by not sheltering in place.   The GSP officers therefore had probable cause to cite Plaintiffs for reckless conduct and could do so without violating the First Amendment.   *Id.*   Plaintiffs completely fail to address this argument in their response brief.

**C.**     **Plaintiffs fail to state a Free Exercise claim under the First Amendment.**

The key inquiry for Plaintiffs' Free Exercise claim is whether Governor Kemp's shelter-in-place order was "neutral and generally applicable."   *First Assembly of God of Naples, Florida, Inc. v. Collier Cnty., Fla.*, 20 F.3d 419, 423 (11th Cir. 1994).   Plaintiffs argue in their response brief that the order was "content based" and "targeted toward worship."   Br. at 10.   But they fail to identify *any* language in the order that supports their argument.   Nor can they because the order does not specifically mention churches or worship services.   *See* Executive Order No. 04.02.20.01; Doc. 24 at 7–10.

Of course, an order that is neutral on its face can still trigger strict scrutiny when it "treat[s] any comparable secular activity more favorably than religious exercise."   *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).   Plaintiffs contend that is the case here because, under the order, "[g]roups that were not churches were permitted to remain open."   Br. at 12. However, what matters is not whether other activities were treated differently from religious activities, but whether "comparable" activities were treated differently.   *Tandon*, 141 S. Ct. at 1296.   "Whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue."   *Id*. "Comparability is concerned with the risks various activities pose, not the reasons why people

gather." *Id*.  Here, Governor Kemp's executive order treats activities that are *comparable* to indoor religious gatherings *the same*.  *See* Executive Order No. 04.02.20.01; Doc. 24 at 7–10. Specifically, the order prohibits indoor gatherings that involve individuals being in close contact with each other for prolonged periods of time, like movie theaters, restaurants, and schools. Because the order treated comparable activities the same, strict scrutiny does not apply.

The Seventh Circuit's decision in *Elim Romanian Pentecostal Church v. Pritzker*, 2020 U.S. App. LEXIS 19049 (7th Cir. 2020), is instructive.  There, the court declined to enjoin an executive order issued by Illinois' governor that prohibited "any gathering of more than ten people," but allowed more than ten people to be present at "essential businesses."  *Elim Romanian Pentecostal Church v. Pritzker*, 613 F. Supp. 3d 1102, 1107 (N.D. Ill. 2020).  The plaintiff (a church), was not considered an "essential business," and thus was limited to having only 10 individuals present on its premises while, for example, grocery stores could host more than 10 individuals.  The Seventh Circuit concluded that the plaintiff failed to show a substantial likelihood of succeeding on the merits because the order "does not discriminate against religious activities, nor does it show hostility toward religion."  *Pritzker*, 2020 U.S. App. LEXIS at *3. This was because the order's "restrictions on public gatherings apply not only to worship services but *also to the most comparable types of secular gatherings*, such as concerts, lectures, theatrical performances, or choir practices, in which groups of people gather together for extended periods."  *Id*. (emphasis added).  The Seventh Circuit further explained that "[w]orship services do not seem comparable to secular activities permitted under the Executive Order, such as shopping, in which people do not congregate or remain for extended periods."  *Id*.

This same reasoning applies here: Governor Kemp's executive order treated secular activities that were "comparable" to attending church services the same.  As a result, the

executive order did not "target" churches or religious activity, and thus is subject to rational basis

scrutiny, which—as explained in Defendants' initial brief—is easily met.

**D.      Plaintiffs fail to state an equal protection claim.**

The "threshold inquiry in an Equal Protection case is whether the plaintiff and the

proposed comparator are similarly situated." *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925

F.3d 1198, 1203 (11th Cir. 2019).  To satisfy this threshold inquiry, the plaintiff must identify a

proposed "comparator" and plead facts to show that he and the proposed comparator are "prima

facie identical in all relevant respects." *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1205 (11th Cir.

2007).  Yet, Plaintiffs alleged in the second amended complaint only that "churchgoers of

congregations which were not predominantly African-American were not targeted" under the

executive orders.  Doc. 24 at ¶ 115.  Plaintiffs argue in their response brief that this allegation

"must be taken as true for purposes of [the Defendants'] motion to dismiss."  Br. at 19.  This is

incorrect.  "Conclusory allegations are not entitled to the assumption of truth." *McCullough v.*

*Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018).  And Plaintiffs' allegation is just that: conclusory.

It states a conclusion (i.e., that non-African American churchgoers were not cited for violating

the executive orders) without providing any factual detail to support it.  In other words, the

second amended complaint does not identify a congregation with predominantly non-African-

American churchgoers that was treated differently in similar circumstances.  Without such fact

pleading, Plaintiffs' equal protection claim fails. *See, e.g.*, *Phillips v. City of Atlanta*, 2016 U.S.

Dist. LEXIS 132360, *38 (N.D. Ga. July 29, 2016) (labeling the plaintiff's allegation that "no

similarly situated white employees … were assigned to work in an Interrogation Room or

otherwise subjected to the negative treatment that [she] endured" as conclusory).

Next, Plaintiffs criticize Defendants for "fail[ing] to cite to any instance in which other

churches that were not predominantly African American were prosecuted for violating executive orders under similar facts." Br. at 19. But the burden of pleading sufficient factual allegations—and the burden of identifying potential comparators—rests on Plaintiffs, not Defendants. *See, e.g.*, *Kessler v. City of Key West*, 2022 U.S. App. LEXIS 5302, *12 (11th Cir. Feb. 28, 2022) (noting that *plaintiffs* are "required to identify a comparator at the motion-to-dismiss stage"). What is dispositive here is that the second amended complaint does not identify a similarly situated non-African-American congregation that was treated differently with respect to the executive orders, and without that there is no basis for an equal protection claim. *See, e.g.*, *Garner v. Bryson*, 2018 U.S. Dist. LEXIS 230515, *6 (M.D. Ga. Jan. 12, 2018) (dismissing the plaintiff's equal protection claim because he "has provided no information about any possible comparators").

**E.      Qualified immunity bars Plaintiffs' individual-capacity § 1983 claims.**

Although unclear, Plaintiffs seem to argue that qualified immunity does not apply here because Defendants were not acting within the scope of their discretionary authority. Br. at 20. This is plainly incorrect. A government official acts within his discretionary authority if his actions were: "(1) undertaken pursuant to the performance of his duties and (2) within the scope of his authority." *Mikko v. City of Atlanta*, 857 F.3d 1136, 1144 (11th Cir. 2017). In other words, the government official "must have been performing a function that, but for the alleged constitutional infirmity, would have fallen with[in] his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). When conducting this analysis, courts must "remove the constitutional taint," *id.*, and "strip away" the alleged unconstitutionality of the government official's actions, *Estate of Cummings v. Davenport*, 906 F.3d 934, 942 (11th Cir. 2018). Stated differently, courts must "temporarily put[] aside the fact

6

that [the government official's actions] may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Id*. at 940.

Thus, the inquiry here is whether issuing executive orders and questioning and citing individuals who have violated the law fall within Governor Kemp and the GSP officers' respective "job description[s]." *Holloman*, 370 F.3d at 1266. There can be no doubt that they do. The Georgia Constitution explicitly states that "[t]he chief executive powers shall be vested in the Governor." Ga. Const. Art. V, § II, Para. I. And Georgia law specifically gives Georgia State Patrol officers authority to "make initial inquiries into any situation which occurs off the public roads and highways and which occurs under circumstances where [there are] reasonable grounds to believe a criminal law has been, is being, or is about to be violated" and to "make arrests in connection with such initial inquiries." O.C.G.A. § 35-2-33(a)(5)(A). Additionally, Governor Kemp's Executive Order No. 04.02.20.01 specifically authorized the Department of Public Safety (which the Georgia State Patrol is part of) to "provide resources … to assist in the enforcement of this Order."

Plaintiffs' reliance on *Payne v. DeKalb Cty.,* 414 F. Supp. 2d 1158 (N.D. Ga. 2004), is misplaced. As an initial matter, *Payne* is not binding authority. *See Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991). In any event, *Payne* is distinguishable on its facts. There, the plaintiff and one of the defendants got into a heated argument about the defendant's daughter riding her bicycle in the plaintiff's yard. *Payne*, 414 F. Supp. 2d at 1166. After the argument, the defendant called a magistrate judge, asked if any charges could be brought against the plaintiff, and then called the DeKalb County Police Department and informed an officer that the judge would sign a warrant for the plaintiff's arrest. *Id*. at 1167. Although the defendant was an

employee of the DeKalb County Police Department, at the time that she made these calls she was "not on duty as a DeKalb County police officer … and she was acting as a private citizen." *Id*. at 1166.  After the plaintiff was arrested and cleared of all charges, she sued the defendant (and others) for malicious prosecution and false arrest.  *Id*. at 1164.  The defendant argued that she was entitled to qualified immunity, but the district court disagreed.  The district court concluded that the defendant "was not acting within her discretionary authority as a police officer when causing the arrest of plaintiff, *but was instead acting as a private citizen* seeking the arrest of a neighbor with whom she had simply had a quarrel." *Id*. at 1171 (emphasis added).  Because the defendant was acting "off-duty" as a private citizen, the district court declined to apply qualified immunity.  *Id*.

The situation here is much different.  The GSP officers were not "acting as [] private citizen[s]" when they questioned Plaintiffs and cited them for violating Governor Kemp's executive orders.  Likewise, Governor Kemp was not acting as a "private citizen" when he issued the executive orders.  To the contrary, the second amended complaint makes it clear that the GSP officers were "with the Georgia State Patrol during the acts alleged herein" and that Governor Kemp issued the executive orders "as Governor of the State of Georgia."  Doc. 24 at ¶¶ 1–8, 14.

Because the GSP officers and Governor Kemp were acting within their "discretionary authority," Plaintiffs bears the burden of showing that qualified immunity is not appropriate. Specifically, they must show: "(1) that [Defendants] violated [their] constitutional rights, and (2) that, at the time of the violation, those rights were clearly established … in light of the specific context of the case, not as a broad general proposition." *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017).  To satisfy the second prong, Plaintiffs were required to "identify a case

where [a defendant] acting under similar circumstances … was held to have violated the [Constitution]." *White v. Pauly*, 580 U.S. 73, 79 (2017).  While the case need not be directly on point, "it must be close enough to have put the statutory or constitutional question beyond debate." *Gaines v. Wardynski*, 871 F.3d 1203, 1209–10 (11th Cir. 2017).  In other words, the preexisting precedent must "dictate[], that is, truly compel[], the conclusion for all reasonable, similarly situated public officials that what [the defendant] was doing violated [the plaintiff's] federal rights." *Evans v. Stephens*, 407 F.3d 1272, 1282 (11th Cir. 2005).

Plaintiffs have not even attempted to identify such pre-existing precedent in their response brief.  Nor can they.  The COVID-19 pandemic was a novel situation—there is no controlling caselaw that "dictates" or "truly compels" the conclusion that Plaintiffs' rights were allegedly violated.  Quite the opposite, as pre-existing Supreme Court precedent *supported* the conclusion that shelter-in-place orders are constitutional.  *See, e.g.*, *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 27 (1905) (holding that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members" because the Constitution does not guarantee "an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint"); *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) (explaining that "[t]he right to practice religion freely does not include liberty to expose the community … to communicable disease").  Indeed, courts from other jurisdictions that have considered similar executive orders have concluded that the law in this area is not "clearly established." *See, e.g.*, *Horizon Christian Sch. v. Brown*, 2022 U.S. App. LEXIS 31766, *5 (9th Cir. Nov. 17, 2022) (concluding that "the caselaw about Covid-19 closures was far from established when [the governor] issued her orders in the summer of 2020"); *Abiding Place Ministries v. Newsom*, 2023 U.S. Dist. LEXIS 25252, *13 (S.D. Ca. Feb. 14, 2023) (concluding

that "there was no clear precedent in March or April 2020 that would have put every reasonable official on notice that promulgating orders restricting in person religious gatherings to slow the spread of the COVID-19 virus was clearly and definitively unconstitutional").  For these reasons, Plaintiffs' section 1983 claims are barred by qualified immunity and must be dismissed.

**F.      Sovereign immunity bars Plaintiffs' state law tort claims under the Georgia Tort Claims Act.**

As explained in Defendants' initial brief, Plaintiffs failed to comply with multiple provisions of the Georgia Tort Claims Act, including its ante litem notice and service provisions, and its prohibition on naming individual state employees as defendants.  In response, Plaintiffs argue that the Act does not apply because Defendants (in their view) violated the law and, hence, were not "acting within the scope of [their] official duties or employment."  Br. at 21.

Plaintiffs' argument misses the mark.  The Act says that "[a] state officer or employee who commits a tort while acting within the scope of his or her official duties or employment is not subject to lawsuit or liability therefor."  O.C.G.A. § 50-21-25(a).  This immunity reflects the "public policy of this state" that "state officers and employees shall not be subject to lawsuit or liability arising from the performance or nonperformance of their official duties or functions."  O.C.G.A. § 50-21-21(b).  The purpose of this "broad immunity" is to allow "state officers and employees [to] be free to act within the scope of their state employment without fear of lawsuits and loss of personal assets" *Gowen Oil Co. v. Streat*, 324 Ga. App. 370, 370 (2013).  This immunity "has been construed broadly to include *unauthorized tortious acts* that occur during the time the officer or employee is engaged in performance of his official duties."  *Tootle v. Cartee*, 280 Ga. App. 428, 430–31 (2006) (emphasis added).  In fact, the immunity is so broad that it cannot be abrogated by "allegations that the state employee's actions were ill-intentioned or motivated by malice."  *Id*.

The analysis for official immunity does not turn upon whether the alleged unlawful conduct is part of a state employee's official duties or employment (indeed, committing a tort would *never* be part of a state employee's job description). *See, e.g., Pelham v. Bd. of Regents of the Univ. Sys. of Ga.*, 321 Ga. App. 791 (2013) (applying the Act to a college football coach accused of violating Georgia's criminal anti-hazing statute by requiring team members to fight each other at football practice); *Mattox v. Bailey*, 221 Ga. App. 546, 546 (1996) (applying the Act to a corrections officer accused of slamming an inmate's head into a door and beating him while escorting him across prison grounds).  Nor does the analysis turn upon whether the state employee's allegedly tortious actions were authorized by a policy or law.  For example, in *Tootle v. Cartee*, 280 Ga. App. 428 (2006), a recently-fired instructor at a state technical college sued several school administrators for allegedly defaming her to students and other faculty regarding the reasons for her termination.  *Id.* at 430.   Because the college's policies prohibited personnel who were involved in terminating a teacher to disclose the reasons for such action to students or other faculty members, the former instructor argued that the administrators' statements could not have been made within the scope of their employment.  *Id.*  The Georgia Court of Appeals rejected this argument because the Act's "exemption of state officers and employees from liability for torts committed while acting within the scope of their official duties or employment 'has been construed broadly' to include unauthorized tortious acts that occur during the time the officer or employee is engaged in performance of his official duties."  *Id*.

The Court of Appeals' decisions in *Davis v. Standifer,* 275 Ga. App. 769 (2005), and *Ferrell v. Young*, 323 Ga. App. 338 (2013), provide even stronger examples of the decoupling of the immunity analysis from the ultimate merits question—i.e., whether the defendant committed the alleged tort.  In *Davis*, the court held that, because it is a part of state troopers' jobs to make

traffic stops, a state trooper accused of committing a sexual assault during a traffic stop is immune from suit (even though it is not a part of the official duties or employment of a state trooper to sexually assault motorists). 275 Ga. App. at 772–73. And in *Ferrell,* the court similarly held that, because it is part of the Georgia World Congress Center's ("GWCC") police officers' jobs to make arrests, a GWCC police officer accused of committing a sexual assault while making an arrest is immune from suit. 323 Ga. App. at 343–44.

Here, Governor Kemp was clearly acting within the scope of his official duties when he issued his COVID-19 executive orders. Indeed, he issues hundreds of executive orders each year—they are part and parcel of his role as the head of the State of Georgia's executive branch. *See* https://gov.georgia.gov/executive-action/executive-orders. Likewise, the GSP officers were also clearly acting within the scope of their employment when they engaged in the essential job function of questioning and citing individuals for violations of the law. This is true even if Governor Kemp and the GSP officers' conduct was tortious (and it was not). *See Davis v. Standifer,* 275 Ga. App. 769 (2005).

## II.    <u>CONCLUSION</u>

For the reasons set forth above and in their opening brief, Governor Kemp and the GSP Troopers ask that the second amended complaint and all claims asserted against them be dismissed.

Respectfully submitted, this 1st day of September, 2023.

|  |  |
|---|---|
| CHRISTOPHER M. CARR | 112505 |
| Attorney General | |
| | |
| LORETTA L. PINKSTON-POPE | 580385 |
| Deputy Attorney General | |
| | |
| ROGER A. CHALMERS | 118720 |
| Senior Assistant Attorney General | |

*/s/ Ellen Cusimano*\
ELLEN CUSIMANO                               844964\
Assistant Attorney General


WADE W. HERRING, III                      278313\
Assistant Attorney General


Ellen Cusimano\
State Law Department\
40 Capitol Square SW\
Atlanta, GA  30334\
Tel: (404) 463-8850\
Fax: (404) 651-5304\
Email: ecusimano@law.ga.gov

## CERTIFICATE OF SERVICE

I certify that I have, on this day, served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

This 1st day of September, 2023.

*/s/ Ellen Cusimano*
Ellen Cusimano